**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GLENDON GRIFFITH,**

                                             **Plaintiff,**

        **v.**                                                    **1:14-cv-1128**

**THE NEW YORK STATE DEPARTMENT**
**OF HEALTH, OFFICE OF THE MEDICAID**
**INSPECTOR GENERAL,** **_et al._,**

                                             **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.    INTRODUCTION**

        Presently before the Court is Defendants' motion for summary judgment in this

employment discrimination action. Dkt. No. # 41.  The Court has determined to decide the

motion without oral argument, and in doing so has considered all of the parties'

submissions.  For the reasons that follow, the motion is granted in part and denied in part.

**II.   STANDARD OF REVIEW**

        On a motion for summary judgment the Court must construe the properly disputed

facts in the light most favorable to the non-moving party, _see Scott v. Harris_, 127 S. Ct.

1769, 1776 (2007), and may grant summary judgment only where "there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); _see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA_, 642 F.3d

110, 116 (2d Cir. 2011).

### III.    BACKGROUND

#### a.    Procedural

Plaintiff Glendon Griffith commenced this action asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination and Employment Act ("ADEA"), and 42 U.S.C. §§ 1981 and 1983.  *See* Dkt. No. 1,  ("Compl.").  The First and Second Causes of Action allege that the New York State Office of the Medicaid Inspector General ("OMIG") and New York State Medicaid Inspector General James C. Cox  ("Cox") are liable for damages for engaging in racial and national origin discrimination in violation of Title VII. (Compl. ¶¶ 64-71).  In the Third Cause of Action, which arises under the ADEA, Plaintiff seeks "prospective injunctive relief" against the Individual Defendants "in the form of a promotion to a G-21 Medicaid Inspector II and/or promotion to a higher grade and title." (Compl. ¶ 72-74).  Finally, in the Fourth and Fifth Causes of Action, which arise under 42 U.S.C. §§ 1981 and 1983, Plaintiff seeks monetary damages against the Individual Defendants in their individual capacities and prospective injunctive relief against them in their official capacities "in the form of a promotion to a G-21 Medicaid Inspector II and/or promotion to a higher grade and title." (Compl. ¶ 75-86).

In a decision that addressed Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's claims, *see* Dkt. No. 21, the Court dismissed all claims arising from Plaintiff's 2009 demotion, all claims against Christopher Bedell, and all § 1983 claims against Cox.  Dkt. No. 21 at 20-21.  The remaining defendants are OMIG; Cox; Maureen Howley ("Howley"); Mark Hennessey ("Hennessey"); Robert Byrnes ("Byrnes"); Levon Aharonyan

("Aharonyan"); Martin Mack ("Mack"); and Maureen DeRosa ("DeRosa").[1]   The remaining

claims are: (1) racial discrimination under Title VII against OMIG; (2) national origin

discrimination under Title VII against OMIG; (3) age discrimination under the ADEA against

Cox; and (4) violations of the Constitution's Equal Protection Clause under 42 U.S.C. §

1983 against the Individual Defendants except for Cox.

### b.    Factual

This case, which alleges discriminatory failure-to-promote claims, arises in the

somewhat byzantine New York state public employee promotion and appointment process.

The relevant facts, set forth in the light most favorable to Plaintiff, are as follows.

### 1.  General

Plaintiff is a fifty-four year old Black male who was born in the Republic of Trinidad

and Tobago where he resided until he emigrated permanently to the United States of

America in 1990.  Griffith Decl. ¶¶ 5-7.  He was hired by the State of New York as a Grade

17 Medicaid Investigator I ("MI-1") on September 13, 1990.[2]  Plaintiff has an accent that is

readily noticeable to English speakers of American origin. Griffith Decl. ¶ 8.   He contends

that he discussed his national origin with Defendants Howley (the Medicaid Inspector in

Charge), Byrnes (an Assistant Medicaid Inspector in Charge), and Aharonyan (an Assistant

Medicaid Inspector in Charge) at various points during his employment. Griffith Decl. ¶ 10.

---

[1]OMIG, Cox, Howley, Hennessey, Byrnes, Aharonyan, Mack, and DeRosa are referred to as the "Defendants," collectively, and Cox, Howley, Hennessey, Byrnes, Aharonyan, Mack, and DeRosa are referred to as the "Individual Defendants," collectively.

[2]When Griffith was originally hired, his position was within the State Department of Social Services. The position was subsequently transferred to the Department of Health and finally to OMIG. At the time this matter was commenced, Griffith was a Grade 17 MI-1.  Due to a recent restructuring of civil service titles, Griffith's title is now Grade 18 Investigative Specialist 1. Griffith Decl. Ex. A.

Further, he believes they were all aware of that he was Black and of his approximate age based upon his readily observable appearance. *Id.* Plaintiff admits, however, that he cannot identify any circumstances in which any of the Individual Defendants criticized, insulted, or disparaged his age, race, or national origin. Pl. Resp. to Def. Stat. Mat. Facts ("Pl. Resp.") ¶ 4.

### 2.  MI-1 Performance

All of the performance evaluations Plaintiff received as an MI-1 rated his performance as satisfactory or better. Griffith Decl. ¶ 13.  His responsibilities as an MI-1 involve investigating potential and actual cases of Medicaid fraud.  These responsibilities include conducting inspections of pharmacies, conducting undercover investigations of medical facilities and practitioners, conducting surveillance, testifying in court proceedings against medical providers, and collecting and securing evidence. *Id.* ¶ 14.

### 3.  2008 Promotion to MI-2 position

In 2008, Plaintiff was promoted to grade 21 Medicaid Investigator II ("MI-2").  At this time, Plaintiff was subjected to fingerprinting and a background check, which he was told were necessary for his promotion.  *Id.* ¶¶ 15-16.

Plaintiff's responsibilities as an MI-2 primarily revolved around supervising a unit of undercover employees in the New York City area.  These employees would use Medicaid cards at doctors' offices and fill prescriptions at pharmacies with Medicaid cards in order to investigate suspected instances of Medicaid fraud.  *Id.* ¶ 17.   Plaintiff was responsible for supervising at least ten employees as an MI-2. *Id.* ¶ 23.  To his knowledge, no other MI-2 was responsible for supervising as many employees at that time. *Id.*

4

Howley was responsible for the day-to-day operations of the New York City office in which Plaintiff worked as an MI-2. *Id.* ¶ 18. Byrnes was his direct supervisor at some point while he was serving as an MI-2, and was his direct supervisor at the time he was demoted back to a MI-1 position (discussed *infra*). *Id.* ¶ 19.

During his time as a MI-2, Plaintiff requested additional resources on multiple occasions but was never provided any of the significant resources he requested. *Id.* ¶ 20. For example, he requested from Byrnes and Howley, but did not receive, additional administrative help because the undercover shopper unit was understaffed. *Id.* He also advised Byrnes that it took additional time to process certain reports because the individuals who wrote the reports did not speak English as their first language,[3] but he was not provided with any additional resources to assist in processing these reports. *Id.* ¶ 21.

Plaintiff contends that Byrnes told him that he "could not ask me to do any more" than Plaintiff was already doing in the MI-2 position, or words to that effect. *Id.* ¶ 23. He also contends that Byrnes "consistently provided [Plaintiff] with positive feedback on [his] work." *Id.* Byrnes recalls Plaintiff as a "hard worker" (Byrnes Dep. Tr. at 17), who "tried to do the best that he could do" (Byrnes Dep. Tr. at 20). Byrnes testified that he "felt bad" when Plaintiff was terminated from his MI-2 position (Byrnes Dep. Tr. at 19).[4]

### 4. March 2009 Demotion

---

[3]Plaintiff explains that "this occurred because our office investigated cases in areas of New York City which included large populations of immigrant groups from particular regions of the world who often speak languages other than English. It was often advantageous to our investigations in these areas to use individuals who spoke the language commonly used in that particular area." Griffith Decl. ¶ 21.

[4]Byrnes also later sent an email to Deputy Medicaid Inspector General for Investigations Michael Little ("Little") with a copy to Howley advocating for the promotion of certain individuals, which included a request that Little "Please do whatever you can for...Glendon as well." Sansivero Decl. Ex. B.

In March of 2009, Plaintiff was demoted to a MI-1 position. *Id.* 24. He contends that the demotion occurred without having ever been given a negative performance evaluation of his work as a MI-2. *Id.* At the meeting discussing this demotion, Howley purportedly told Plaintiff, in sum and substance, that he "didn't know how Albany works." *Id.* 25. Defendants argue, however, that Plaintiff's assignment as a MI-2 was a probationary assignment, and that his demotion was due to poor performance. Howley Decl. ¶¶ 14-17 and Exs. B-C. In June 2009, Plaintiff wrote to Howley asking her to reconsider his demotion, *id.* 28, but apparently received no response.

### 5.  MI-2 position with Item No. 33512 (NYC)

On April 20, 2010, a MI-2 position with Item No. 33512 became vacant in New York City. Howley Decl. ¶ 23; Howley Dep. Tr. at 21; Tompkins Decl. ¶ 25. Howley prepared and signed a Position Action/Waiver Request ("PAR") on May 7, 2010 ("May 2010 PAR"),[5] and Sherri Tompkins, a Human Resources Specialist 2 at OMIG,[6] reviewed and signed it on May 14, 2010. Howley Dep. Tr. at 20-21; Howley Decl. Ex. F. Tompkins Decl. Ex. C.   A

---

[5]On August 21, 2008, the New York State Division of the Budget ("DOB") issued Budget Bulletin B-1182, entitled "Statewide Hiring Freeze Guidelines." Tompkins Decl. ¶ 9 and Ex. B ("Budget Bulletin"). The Budget Bulletin advised, *inter alia*, that then-Governor David Paterson "ordered … a hard freeze on all State hiring." Budget Bulletin at OMIG000957. This hiring freeze "is a comprehensive prohibition on all promotions, transfers, new hires, and position upgrades done through reclassification actions unless individually justified, and authorized by" DOB. *Id.* at OMIG000957. To fill a position, agencies must submit requests for waivers to DOB via the New York State Electronic Personnel System ("NYSTEP"), and waivers will only be granted under limited circumstances (e.g. ensuring health and safety, generating revenue, or providing essential support for the agency's core mission). *Id.* at OMIG000958. A waiver, which "is used to temporarily suspend the hiring freeze for a specific item or group of items to allow for individuals to be appointed," remains 120 days from DOB approval. *Id.* at OMIG000960 (formatting and emphasis in original).  If the position is not filled within those 120 days, the hiring freeze for the position is reinstated. *Id.* at OMIG000960. The 2008 hiring freeze remains in place today. Tompkins Decl. ¶ 15. OMIG has been filling positions using the waiver request process. *Id.* ¶ 18.

[6]Ms. Tompkins' responsibilities in this position included processing paperwork such as PARs, reviewing applicant qualifications, and canvassing the list of potential appointees relating to hiring individuals. Tompkins Decl. ¶ 5.

PAR is an internal OMIG document that is part of the process to obtain a waiver of the statewide hiring/promotion freeze. *See* fn. 5, *supra*. A PAR requires approval only from within OMIG. Tompkins Decl. ¶ 27. OMIG must approve the PAR before the agency seeks a waiver from the New York State Division of the Budget ("DOB"). *Id.* If OMIG approves the PAR, a "waiver request" is then submitted electronically to DOB. *Id.* ¶ 28.

After OMIG approved the PAR, Tompkins submitted a waiver request to DOB on May 27, 2010. Tompkins Decl. ¶ 30. DOB approved the request on June 11, 2010. Because of the time limitations of such waivers, *see* fn 5, *supra*, if the position to which the PAR was attached (here, the New York City MI-2 position) was not filled by October 9, 2010, the hiring freeze for the position would be reinstated. *Id.* ¶ 30 and Ex. D.

In June 2010, OMIG issued an Announcement of Job Vacancy for the New York City MI-2 position, designated as Item No. 33512. Tompkins Decl. Ex. E. Plaintiff submitted an application. *Id.* An interview panel consisting of OMIG employees Kevin Dowell ("Dowell"),[7] Fern DePaulo ("DePaulo"), and Susan Hamill ("Hamill") interviewed applicants, including Plaintiff.[8] Plaintiff was informed that he was the highest scoring candidate and that he would be nominated for promotion. Griffith Decl. ¶ 31; *see also* Howley Decl. ¶ 25 (the panel selected Plaintiff for the position in September 2010); Tompkins Dec. ¶ 33 ("In or about October 2010, Howley advised me that Plaintiff had been selected for the MI-2 position bearing Item No. 33512."). Typically, such a selection would result in the candidate being promoted. Howley Dep. Tr. at 32; Byrnes Dep. Tr. at 36. Griffith's selection for the

---

[7]At the time of the interview, Dowell was Plaintiffs's direct supervisor. Griffith Decl. ¶ 30.

[8]Such interviews were a typical part of promotional procedures at OMIG. Byrnes Dep. Tr. at 45-46.

position, however, appeared to upset Howley because she did not feel he was the best candidate. Byrnes Dep. Tr. at 34. Howley then approached the panelists and asked each to reconsider their recommendation that Griffith be promoted. Griffith Decl. Ex. F (Dowell Aff.). Howley stated to panelist Dowell that "Albany was questioning the selection" and asked him to reconsider his recommendation. *Id.* The same request for reconsideration was apparently made to the other two panelist. *Id.* The panelists refused to change their rankings and confirmed their belief that Griffith was the best candidate for promotion. Howley Dep. Tr. at 39-40.

Howley then executed a form titled "Nomination for Appointment or Promotion" recommending that Griffith be promoted to MI-2 in OMIG's New York City Office. Howley Decl. Ex. G. However, subsequent to signing the form, she again asked the panelists to "reconfirm" their recommendation of Griffith, which they did. Howley Decl. Ex. H. A nomination package was then forwarded to the Governor's Appointments Office ("GAO") via Defendant Hennessey.[9]  Hennessey Decl. Ex. B at P108.[10]  On October 28, 2010, the GAO approved of the appointment of Griffith to the New York City MI-2 position. Tompkins Decl. Ex. G. However, the DOB waiver for the position had expired on October 10, 2010, and thus, Tompkins submitted another waiver request to DOB. Tompkins Decl. ¶ 35. DOB

---

[9]Hennessey was the Assistant Medicaid Inspector General at OMIG at the time. His responsibilities included transferring OMIG's nomination packets for appointments and promotions to GOA for approval.

[10]MI-2 positions are in the non-competitive jurisdictional class. Tompkins Decl. ¶ 19 and Ex. A ("Tompkins Dep. Tr.") at 57. The individual selected for a non-competitive position need not take a civil service examination, but must meet certain minimum qualifications. Tompkins Decl. ¶ 20; Tompkins Dep. Tr. at 57. OMIG must submit the name of the individual selected to the Governor's Appointments Office ("GAO") for its approval. Tompkins Decl. ¶ 21; Tompkins Dep. Tr. at 58. Nomination packets may also be submitted to GAO. Tompkins Decl. ¶ 22; Tompkins Dep. Tr. at 58. Nomination packets typically included a cover letter to GAO, the nominee's résumé, and a position action request. Hennessey Decl. ¶ 9 and Ex. A. ("Hennessey Dep. Tr.") at 7-8. The GAO process is separate and apart from the DOB waiver request process. Tompkins Decl. ¶ 23.

approved the waiver effective January 14, 2011 thru May 14, 2011. *Id.* ¶ 35 and Ex. H.

### 6. MI-2 position with Item No. 31452 (Syracuse)

At approximately the same time that the MI-2 (NYC) position that Plaintiff was nominated for opened, a MI-2 position opened in Syracuse.  This MI-2 position was identified as Item Number 31452.   In March 2010, Sam Spitzberg nominated an individual named Teresa Pearlroth ("Pearlroth") to fill the MI-2 position (Syracuse), Item Number 31452. Tompkins Decl. ¶ 58; Def. SOMF ¶ 81.  A DOB waiver was requested for the position and the nomination packet was sent to GAO for approval on March 18, 2010. Tompkins Decl. ¶ 58 and Ex. S.  DOB approved the waiver and it was effective until May 14, 2011 but expired before receiving GAO approval to appoint a nominee to the MI-2 position in Syracuse. *Id.* ¶ 59 and Ex S.  At some point during the process of obtaining approval, Pearlroth advised OMIG that she was not interested in the position. Tompkins Decl. ¶ 60; Tompkins Dep. Tr. at 130.  As discussed more fully below, the Syracuse MI-2 position, Item Number 31452, was eventually moved to New York City and filled by Christopher Bedell, a Caucasian American male approximately twenty years younger than Plaintiff.

### 7. Appointments under Governor Andrew Cuomo

Defendants contend that once Governor Andrew Cuomo took office on January 1, 2011, OMIG had to resubmit the nominations to GAO. Hennessey Decl. ¶ 19; Hennessey Dep. Tr. at 35.  In January 2011, Tompkins purportedly had conversations with Howley and Deputy Medicaid Inspector General Michael Little about the status of their recruitment plan, which included Plaintiff's nomination for Item No. 33512.  Tompkins Decl. ¶ 37.  Tompkins advised that OMIG had a new DOB waiver, but that she needed to ask Hennessey if OMIG

could appoint Plaintiff based on the October 2010 GAO approval. *Id.*   On January 20, 2011, Hennessey informed Tompkins that with the new administration there was no current GAO process in place and that OMIG may need to resend the paperwork for Plaintiff's nomination when a new process was in place. *Id.* ¶ 38.

On February 7, 2011, Tompkins sent Hennessey an email which stated: "Any update on the GAO process? I have three candidates for Medicaid Investigator positions (Glendon Griffith, Teresa Pearlroth and Eunice Green) that need to go through the process." Tompkins Decl. Ex. J.  Hennessey informed Tompkins that, as of February 18, 2011, Governor Cuomo's GAO "process [was] still not finalized but that as a starting point we should re-send every opening for which we have something pending." *Id.* Ex. K.

On February 24, 2011, Tompkins emailed Hennessey to advise him that "two approved waivers were valid until May 14, 2011 to fill the Medicaid Investigator 2 (33512) in NYC and the Medicaid Investigator 2 (31452) in Syracuse." *Id.* Ex. L.  Tompkins also asked Hennessey to let Tompkins know when GAO's process was finalized so Tompkins could send the nominee information to Hennessey for these two approved positions. *Id.*

On March 31, 2011 Tompkins emailed Hennessey, asking for updates on GAO's process. *Id.* Ex. M.  Tompkins sent Howley, Little, and Factfinder an email dated April 14, 2011 listing positions that they had requested to fill which had waiver requests pending at DOB, requesting that they prioritize the list. Tompkins Decl. ¶ 45 and Ex. N; Tompkins Dep Tr. at 105-106.   Although Griffith's budgetary request had been approved at that time, his

position was not included on the list of positions Tompkins asked Little to rank.[11]  Little responded with a priority list which, Howley testified, would not have been created without her input. Howley Dep. Tr. at 70.  Although Little's email contained text indicating: "Medicaid Investigator 2, SG-21, Glendon Griffith was nominated" under the phrase "Would Like to have," this was in the lowest priority category of the list.  Tompkins Decl. Ex. N.  Plaintiff points out that of the eleven positions listed, only two have not been subsequently filled, both of which were in the lowest priority ranking tier with Griffith.  Sansivero Dec. Ex. D at Interrogatory Response No. 6.

Also on April 14, 2011, Tompkins emailed Hennessey asking if he had any information from GAO, and she noted that the waivers for the two Medicaid Investigator positions would expire on May 14, 2011. Tompkins Decl., Ex. O.  Tompkins sent Hennessey another email on April 28, 2011, repeating that two positions (*i.e.* Item Nos. 31452 (Syracuse) and 33512 (New York City) expire on May 14, 2011. *Id.* Ex. P.   Defendants contend that Tompkins continued to inquire of Hennessey about the status of GAO's process because it was her understanding that the prior GAO approval that OMIG had received in October 2010 for MI-2 item 33512 (New York City) was no longer effective once Governor Cuomo took office. Tompkins Decl. ¶ 49; Tompkins Dep. Tr. at 89 and 99. Defendants assert that because OMIG needed an approved DOB waiver and GAO approval in order to appoint Plaintiff to the position, Tompkins kept checking with Hennessey, but she does not recall Hennessey providing any update of the new GAO process before the DOB

---

[11]Defendants contend that because the MI-2 position item number 31452 (Syracuse) and the MI-2 position item number 33512 (New York City) that Plaintiff had been nominated for had approved waivers as of April 14, 2011, Tompkins did not list those positions in her email. Tompkins Decl. ¶ 46.

waiver expired on May 14, 2011. Tompkins Decl. ¶ 49; Tompkins Dep. Tr. 85-88.

Towards the end of May 2011 and the beginning of June 2011 the Governor's office announced a "Reduction in Workforce" which meant that positions were not going to be filled at that time. Tompkins Decl. ¶ 50; Tompkins Dep. Tr. at 110 and 118. On May 24, 2011, Tompkins emailed Howley stating, *inter alia*: "[T]he approved waiver to fill the Medicaid Investigator position (33512) in NYC expired on 5/14/11. You had nominated Glendon Griffith for the position. Is this still a priority for you to fill? If so, I'll resubmit the waiver request." Tompkins Decl. Ex. Q. Howley replied: "I am inclined to let the waiver expire – the position is not a priority." *Id.* And Tompkins responded: "I will not resubmit a waiver request for this position." *Id.* Tompkins then emailed Hennessey advising him that "the two Medicaid Investigator 2 positions that had approved waivers (Items 31452 and 33512) have expired and the other Medicaid Investigator positions that were pending are not being filled at this time," and that "[a]ll of the positions that were pending waivers are not being filled at this time." *Id.* Ex. R.[12] Howley retired from State service on September 28, 2011. Def. SOMF ¶ 96; Howley Decl. ¶¶ 11 and 49.

### 8. MI-2 position Item No. 31452 (Syracuse) transferred to NYC, Bedell Appointed

Tompkins prepared a PAR prepared on April 9, 2012 indicting that the MI-2 Item No. 31452 (Syracuse) position was moved to New York City. Tompkins Decl. ¶ 61. The position was apparently moved "because the termination of twenty-five contract investigators in September 2011 adversely affected the ability of the New York City Office to conduct

---

[12]Plaintiff asserts that he was never advised that the waiver for the position he was nominated for had expired, or that he was no longer under consideration for a promotion. Griffith Decl. ¶ 41.

investigations." *Id.; see also id.* ¶ 56 ("Each OMIG division (e.g. Investigations, Audit, etc.) is allocated a certain number of positions for each fiscal year (April 1 to March 31), and each division has the discretion to assign or relocate the allocated positions where a division determines a position is needed."). Defendants contend that OMIG wanted to move the recruitment process quickly on this position because OMIG had gone a year without filling the position, Tompkins Decl. ¶ 63; Tompkins Dep. Tr. at 144, and because the DOB waiver for the position was only effective from May 1, 2012 through August 29, 2012. Tompkins Decl. ¶¶ 62-63; Tompkins Dep. Tr. at 143-144.

Defendants maintain that although interviews are typically part of the recruitment process, interviews were not conducted before the selection of Bedell for a MI-2 position because Howley's successor, Anna Coschignano, "upon the recommendation of Byrnes and Aharonyan," had already selected Bedell for the position. Def. MOL p. 17; *see* Tompkins Decl. ¶ 63. Plaintiff contends that the position vacancy was not posted to allow interested candidates to submit applications.

In May 2012, Bedell was nominated for the MI-2 position bearing Item No. 31452, and a nomination packet was submitted to GAO for its approval. Tompkins Decl. ¶ 64. On August 27, 2012, GAO approved the appointment of Bedell to the MI-2 position bearing Item No. 31452. *Id.* Defendants argue that "[a]cting quickly was justified as GAO approved the Bedell nomination just two days before the DOB waiver expired." Def. MOL p. 17; Tompkins Decl. ¶ 65.

Plaintiff alleges Bedell did not meet the pre-existing requirements to be a MI-2, and that Defendants, motivated by discriminatory animus, changed the promotional requirements of the position so that Bedell could be promoted. Compl. ¶¶ 50-50, 56, and

13

59; Pl's Dep. Tr. at 42-43 and 48.  In this regard, Plaintiff contends that Bedell did not have the requisite undercover experience, and thus, OMIG removed that requirement after Bedell's nomination but prior to his appointment so he could be appointed. Pl's Dep. Tr. at 42-43 and 48.  Defendants assert that OMIG removed the undercover experience requirement because this qualification was difficult to verify and not necessarily relevant to the position, Tompkins Decl. ¶ 73, and that discussion about removing the requirement started as early as 2009. Tompkins Decl. ¶¶ 69-70.  Further, Defendants contend that the fact that Bedell's appointment coincided with the change in requirements does not raise an inference of discrimination because Bedell qualified under both sets of requirements.  Def. MOL p. 14.

Plaintiff further contends that other circumstances surrounding Bedell's appointment indicate a discriminatory motivation.  These include that Bedell (1) is approximately 20 years younger than Plaintiff; (2) is a Caucasian man of American national origin; (3) had only two years of experience with OMIG as compared to Plaintiff's 20 years of experience; and (4) was not required to undergo fingerprinting or a background check.[13]  Plaintiff further asserts that when Bedell was promoted to MI-2 in 2012, there were approximately fifteen occupied supervisory positions in OMIG's New York City office, but only one was filled by a non-Caucasian individual and none were filled by individuals of a foreign national origin. Dkt. No. 24 at para. 47.

---

[13]Defendants contend that Bedell had gone through the fingerprinting and background check process when he was was initially hired in 2010, and therefore did not need to go through it for the 2012 promotion. Tompkins Decl. ¶ 95 and Ex. Z.

## IV.    DISCUSSION

### a.  Title VII and ADEA Claims

To state a claim for employment discrimination under Title VII or the ADEA, a plaintiff must allege that he suffered an adverse employment action because of his race, color, religion, sex, national origin, or age. 42 U.S.C. § 2000e–2(a); 29 U.S.C. § 623(a).   The claims are analyzed under the three step burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., id.* (Title VII); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (ADEA).  A plaintiff must first establish a *prima facie* case for discrimination. *McDonnell Douglas*, 411 U.S. at 802. "The requirements to establish a *prima facie* case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012)(internal citations omitted).

If Plaintiff establishes a *prima facie* case, the burden shifts to the defendants to "articulate some legitimate, non-discriminatory reason" for their action. *Id.*  Defendant's burden of production at this stage is not a demanding one, it "need only offer a basis for the employment decision in issue which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Hickey v. Myers*, 852 F. Supp. 2d 257, 267-268 (N.D.N.Y. 2012) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)) (internal quotation marks and citation omitted).

Once a non-discriminatory basis for the adverse employment action is articulated, the presumption of unlawful discrimination dissolves, and the burden shifts back to the

plaintiff to show that the stated reasons were merely pretextual and unlawful discrimination was the true reason for the action. *Id.* at 804; see *Imperato v. Otsego Cty. Sheriff's Dep't*, No. 313CV1594BKSDEP, 2016 WL 1466545, at *15 (N.D.N.Y. Apr. 14, 2016)("If the defendant carries that burden, the presumption of discrimination 'drops from the picture,' and the burden shifts back to the plaintiff, who must 'come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'")(quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) and citing *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013)).  "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42. (internal citations, quotation marks, and punctuation omitted).

### 1. *Prima Facie* Case

To establish a *prima facie* case of discriminatory failure to promote in violation of Title VII or the ADEA, a plaintiff must demonstrate that "'[he] applied for an available position for which [he] was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.'" *Brown v. Coach Stores, Inc*., 163 F.3d 706, 710 (2d Cir. 1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Carter v. Verizon*, 2015 WL 247344, at *4 (S.D.N.Y. Jan. 20, 2015).  "The Circuit has held that when a plaintiff applies for and is denied a position, the fact that the position was filled by someone outside of the plaintiff's protected class is itself enough to give rise to such an inference [of discrimination]." *Feliciano v. City of New York*, 2015 WL 4393163. at *4

(S.D.N.Y.  July 15, 2015)(collecting cases).

Defendants argue that the undisputed facts do not support a *prima facie* case because Bedell did not fill the position to which Plaintiff was nominated.  In this regard, Defendants assert that Plaintiff was nominated for the MI-2 position with Item No. 33512, whereas Bedell was appointed to the MI-2 position with Item No. 31452.  Defendants contend: "Although the tiles are the same, they are considered separate positions, and thus, Bedell's appointment is insufficient to raise an inference of discrimination."  Def. MOL, p. 11.

The Court disagrees that Plaintiff has not met his minimal burden at the *prima facie* stage. The only apparent differences between the two positions are the item number designations and the waivers obtained to fill the positions.   A factfinder could reasonably conclude that once the MI-2 Syracuse position (Item No. 31452) was transferred to New York City, it became the functional equivalent of the MI-2 New York City position (Item No. 33512) that Plaintiff was nominated to assume.  Thus, despite that the facts indicate that the MI-2 Syracuse position (Item No. 31452) was transferred to New York City after the approved waiver to fill the MI-2 New York City position (Item No. 33512) expired, a factfinder could reasonably find that Plaintiff's nomination to position Item No. 33512 should have been applied to position Item No. 31452 once a waiver for that position was obtained. Because it was not, and because the position was awarded to someone outside of Plaintiff's age, race, and national origin protected classes, the facts give rise to an inference of discrimination on these bases.

### 2.  Legitimate, Non-discriminatory Reasons for Actions

Defendants assert that the "five-month effort on Plaintiff's behalf" that OMIG engaged

in to determine "the new GAO process [under Governor Cuomo] for approving Plaintiff's appointment before the expiration of the waiver on May 14, 2011," despite being unsuccessful, "belies any claim that OMIG acted with discriminatory animus."   Def. MOL, p. 17.  They further contend that Bedell was appointed to a different position than Plaintiff was nominated for, and that OMIG acted quickly to appoint Bedell because OMIG was understaffed and they needed to act before the DOB waiver for the MI-2 Syracuse position (Item No. 31452) expired.

This satisfies Defendants' burden of articulating nondiscriminatory reasons for why Plaintiff was not appointed to the MI-2 position he was nominated for and why Bedell was appointed to a MI-2 position under a non-conventional procedure, thereby shifting the burden back to Plaintiff.

### 3.  Plaintiff's Ultimate Burden

Viewing the totality of the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that OMIG's decision to appoint Bedell and not Plaintiff to the MD-2 position in the New York City was motivated by considerations of Plaintiff's race and national origin.

A reasonable factfinder could conclude that OMIG's reason to accept Bedell's nomination without complying with the standard posting and interview process because it needed to expedite filing the position was merely a pretext for discrimination.  Indeed, at the time that the waiver for this position was approved, Plaintiff had already been interviewed and nominated for the same position (albeit under a different Item Number).  A reasonable factfinder could also conclude that if OMIG had accepted its prior vetting process for a MI-2 position in New York City and appointed Plaintiff to the position, there would have been no

18

need to rush Bedell's nomination.  Moreover, a fact finder could look askance at the legitimacy of Bedell's nomination for the position because, at the time, he arguably did not meet the then-existing requirement of two years of undercover experience.[13]  Further, a factfinder could conclude that the position's requirements, which were changed after Bedell's nomination but before his appointment, were modified in order to ensure his appointment at the exclusion of Plaintiff who, at the time Bedell was promoted, had over twenty years of experience with OMIG.

While the evidence discussed above could be construed as indicating an agency bias against promoting Plaintiff, the evidence of racial or national origin animus by OMIG is weak at best.  Nevertheless, when the facts are viewed and their totality, a reasonable factfinder could conclude that the efforts OMIG took to ensure that Bedell was assigned the MI-2 position are evidence of a pretext, and that considerations of Plaintiff's race and national origin motivated the employer's determination.  These facts include Plaintiff's demotion in 2009 despite performing to the expectations of his supervisor; Howley's questioning of panel members' nomination of Plaintiff for a MI-2 position; Howley's decision to let the waiver for the MI-2 position that Plaintiff was nominated to expire as "not a priority;" and the fact that only one non-Caucasian individual and no individuals of foreign national origin occupied supervisory positions in OMIG's New York City office at the relevant time.  Accordingly, that portion of Defendants' motion seeking summary judgment on the Title VII claims is denied.

---

[13] Defendants contend that Bedell met the conditions for the MI-2 position under the old and the new standards based on his employment before joining OMIG and his education.  However, whether he met the conditions for appointment are disputed and thus cannot be determined on this motion.

However, Plaintiff has offered no argument in opposition to that portion of Defendants' motion seeking to dismiss the ADEA claim. *See* Def. MOL, p. 20 ("The record here is also bereft of evidence from which a factfinder could infer that Defendants discriminated against Plaintiff due to his age . . . . The [record reveals] no statements by the Individual Defendants or anyone at OMIG showing any animus toward Plaintiff's age . . . . Defendants are entitled to summary judgment.").   "[T]he failure to oppose a portion of a motion for summary judgment is deemed abandonment of the claim to which the motion applies, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." *Mitchell v. City of Albany*, No. 08–CV–871, 2010 WL 1235389, at *7 (N.D.N.Y. Mar.31, 2010) (citing *Rizzo–Puccio v. College Auxiliary Services, Inc.*, 216 F.3d 1073 (2d Cir. 2000); N.D.N.Y.L.R. 7.1(b)(3)) (internal citation omitted).  Further, the Court has examined the issue and finds no merit to the ADEA claims.  Plaintiff has failed to satisfy his ultimate burden of demonstrating that considerations of his age played any role in OMIG's decision to appoint Bedell to the MI-2 position.   Other than the fact that Bedell is younger than 40 years of age, Plaintiff merely speculates that OMIG decision-makers harbored an age-based animus in reaching the MI-2 appointment determination.  Plaintiff's speculation, however, is insufficient to satisfy his ultimate burden of presented facts from which a jury could reasonably draw the inference that considerations of his age motivated OMIG's decision to appoint Bedell to the MI-2 position in 2012. *See  Bickerstaff*, 196 F.3d at

456;[14] *id.* at 448.[15]  Thus, that part of the motion seeking summary judgment on the ADEA

claims is granted. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561-62 (2d Cir.

1997)(affirming the grant of summary judgment to an employer in an ADEA discriminatory

discharge claim, concluding, *inter alia*, that the record was "bereft of evidence from which a

factfinder could infer that [the employer] discriminated against [the plaintiff] on the basis of

her age.").

### b.  Section 1983 Claims

Next, the Court examines the § 1983 claims against the Individual Defendants.  A §

1983 discrimination claim asserted as an equal protection violation is analyzed under the

same framework as a Title VII or ADEA claim.  *See Chick v. County of Suffolk,* 546 Fed.

Appx. 58, 59 (2d Cir. 2013); *Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d

107, 123 (2d Cir. 2004); *Bohnet v. Valley Stream Union Free Sch. Dist. 13*, 30 F. Supp. 3d

174, 181 (E.D.N.Y. 2014) *aff'd*, 594 Fed. Appx. 53 (2d Cir. 2015).  Thus, the claims are also

analyzed under the three step burden shifting framework articulated in *McDonnell Douglas.*

*See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

In order to prevail on his equal protection claims, Plaintiff must establish that: (1) he

---

[14](Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.").

[15] As indicated in <u>Bickerstaff</u>, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.   This undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

<u>Bickerstaff</u>, 196 F.3d at 448 (internal quotation marks and citations omitted).

was treated differently than others similarly situated, and (2) "this differential treatment was motivated by an intent to discriminate on the basis of race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Brown v. Research Found. of SUNY*, No. 08-CV-592-TJM-DEP, 2009 WL 1504745, at *13 (N.D.N.Y. May 28, 2009). Further, it is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under $ 1983." *Wright v. Smith,* 21 F.3d 496, 501(2d Cir. 1994). Personal involvement can be established by showing: 1) the defendant participated directly in the alleged constitutional violation; 2) the defendant, being aware of the violation, failed to remedy the violation; 3) the defendant created the policy or custom under which the violation occurred; 4) the defendant was grossly negligent in supervising subordinates who committed the violation; or 5) the defendant exhibited deliberate indifference by failing to act on information indicating violations occurred. *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015)

### 1. Defendants Hennessey, Mack, and DeRosa

Plaintiff acknowledges that there is insufficient evidence to support a finding that Hennessey, Mack, and DeRosa fit the above-referenced criteria for personal liability under § 1983, and therefore does not oppose summary judgement with respect to his cause of action under § 1983 for these Defendants. Based on Plaintiff's concession, Defendants' motion in this regard is granted.

### 2. Defendant Howley

Regarding Howley, Plaintiff contends that she was the "leading decision-maker" with respect to his 2009 demotion, that she asked panel members to reconsider their selection

of Plaintiff for a promotion in 2010, she made little effort for him to secure the position other than signing the nomination form, and she let the waiver for his position expire without informing him. From this, Plaintiff contends that Howley's actions "colored the consideration of his candidacy" for a MI-2 position, and thus "was personally involved in the deprivation of [Plaintiff's] rights." Pl. MOL p. 21.

Although the evidence viewed in the light most favorable to Plaintiff indicates that Howley did not want Plaintiff in the MI-2 position, there is insufficient evidence indicating that Howley's reasons were based upon considerations of Plaintiff's race. Kevin Dowell, a panelist for Plaintiff's nomination, indicates that Howley asked him to reconsider the nomination because "Albany was questioning the selection." Dowell Aff. ¶ 7; *see* Howley Decl. ¶¶ 27-28.[16] Plaintiff's argument that Howley's position was based upon consideration of his race is based upon speculation about Howley's true motivations, but this speculation is insufficient to defeat summary judgment.

Further, Howley's actions are too attenuated from the 2012 appointment of Bedell to constitute personal involvement. Presuming, for purposes of argument, that Plaintiff's constitutional rights were violated when Bedell was appointed the MI-2 position instead of Plaintiff, Howley cannot be found personally liable for this constitutional violation because she retired in 2011. There is insufficient evidence indicating that she played any role in the decision to nominate and appoint Bedell to the MI-2 position. Accordingly, Defendants' motion seeking summary judgment on the §1983 claim against Howley is granted.

---

[16](Indicating that when Howley was advised by the panel of the decision to nominate Plaintiff, she "responded that people may question the selection, and that I needed them to reassure me that Plaintiff was ready and will not fail again.")

### 3. Byrnes

Plaintiff contends that Defendant Byrnes's personal involvement is demonstrated because Byrnes either participated in the decision to demote Plaintiff in 2009 or failed to take action to correct that decision; failed to take action to stop "Howley's campaign against Griffith's nomination or [to take] any action to support Griffith's nomination"; "was directly involved in the decision to hire Bedell by recommending Bedell to Anna Coschignano, Howley's successor;" and, "[d]espite knowing that expedited appointment procedure without posting and interviews was abnormal, [he] supported the decision to promote Bedell" and, therefore, "failed to take action against known [constitutional] violations, and/or exhibited deliberate indifference by failing to act on information [that] indicated violations had occurred." Pl. MOL p. 21.

The first issue, Byrnes's role in the 2009 demotion, is of no moment.  There is no indication that Byrnes's action or inaction related to the 2009 demotion was motivated by considerations of Plaintiff's race.  Likewise, there are no facts indicating that Byrnes's failure to stop Howley's comments to the nominating panel were motivated by Byrnes's considerations of Plaintiff's race, or, even if they were, that they resulted in Plaintiff suffering a constitutional violation.  Simply stated, neither Byrnes's actions or inactions, nor Howley's actions, resulted in Plaintiff being denied the nomination for the MI-2 (New York City) position.

Regarding Byrnes's recommendation of Bedell for the MI-2 spot in 2012, the facts are undisputed that Plaintiff's name "did not come up" during the discussions between Byrnes and Coschignano. Pl. Resp. ¶ 91.  Further, and assuming Byrnes was aware that Bedell's nomination was proceeding without the normal vetting procedures, that fact, in and

of itself, does not indicate that Byrnes acted with racial animus in recommending Bedell. While Plaintiff views the situation with the perspective of hindsight, his contention that Byrnes was motivated by racial animus toward Plaintiff when he recommended Bedell is based upon nothing more than surmise and speculation. Thus, like the claim against Howley, Plaintiff's §1983 claim against Byrnes is based upon mere speculation of discriminatory animus, which is insufficient for Plaintiff to meet his ultimate burden on this claim.

Finally, there is insufficient evidence upon which to find Byrnes personally liable for any constitutional violation that occurred.  There is no legitimate dispute that the decision to promote Bedell was made by Coschignano, Byrnes's superior. *See* Tompkins Decl. ¶ 62; Pl. Resp. to Def. SOMF, ¶ 88.   Byrnes's role in his decision was limited to his discussions with Coschignano about whether Bedell was suitable for the position.  But, as indicated above, Plaintiff presents insufficient evidence indicating that Byrnes harbored racial animus toward Plaintiff, or that he made any statements about Plaintiff during his discussions with Coschignano. Thus, Byrnes cannot be personally under the theories that he participated directly in the alleged constitutional violation, that he was grossly negligent in supervising subordinates who committed the violation, or that he created a policy or custom under which the violation occurred.

Further, there is insufficient evidence indicating that Coschignano harbored racial animus toward Plaintiff, or that she expressed to Byrnes a race-based motivation in promoting Bedell over Plaintiff.  Thus, even assuming, *arguendo*, that the decision to promote Bedell violated Plaintiff's constitutional right to equal protection, there is insufficient evidence to find Byrnes personally liable by being aware of the violation yet failing to

remedy it, or by exhibiting deliberate indifference by failing to act on information indicating that a violation occurred.  Accordingly, the §1983 claim against Byrnes is dismissed.

### 4.  Aharonyan

Plaintiff makes essentially the same arguments against Aharonyan as he does against Byrnes, but ultimately he fails to present sufficient evidence indicating that Aharonyan harbored racial animus against Plaintiff, that he conveyed any such animus to Coschignano during the discussions about Bedell's suitability for the MI-2 position, or that he was aware that a constitutional violation was taking place by the promotion of Bedell to the MI-2 position in 2012. Thus, for the reasons discussed above with regard to Byrnes, the §1983 claim against Aharonyan is dismissed.

## V.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (dkt. # 41) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted in that all ADEA and all Section 1983 claims are **DISMISSED**, and denied in all other respects. Consequently, the case proceeds to trial on Title VII claims against the New York State Office of the Medicaid Inspector General, the sole remaining defendant in this action.

**IT IS SO ORDERED.**

Dated:September 27, 2017

Thomas J. McAvoy
Senior, U.S. District Judge

26